405 So.2d 1148 (1981)
Ossie BROWN, District Attorney
v.
The EAST BATON ROUGE PARISH SCHOOL BOARD, etc.
The LEAGUE OF WOMEN VOTERS OF BATON ROUGE, INC.
v.
The EAST BATON ROUGE PARISH SCHOOL BOARD, et al.
Nos. 14292, 14293.
Court of Appeal of Louisiana, First Circuit.
October 12, 1981.
Rehearing Denied November 23, 1981.
*1149 Ossie B. Brown, Dist. Atty., Robert H. Hester, Asst. Dist. Atty., Baton Rouge, for Ossie Brown.
David Price, Baton Rouge, for amicus curiae.
*1150 John F. Ward, Jr. and Robert L. Hammonds, Baton Rouge, for East Baton Rouge Parish School Bd., et al.
Stephen M. Irving, Baton Rouge, for League of Women Voters of Baton Rouge, Inc.
Before CHIASSON, EDWARDS, and LEAR, JJ.
LEAR, Judge.
These consolidated appeals arise from two suits brought against the East Baton Rouge Parish School Board (the Board) and its Superintendent Search and Selection Committee alleging their violation of the Louisiana Open Meetings Law (LSA-R.S. 42:4.1, et seq.). These suits, brought by Ossie Brown, District Attorney for the Nineteenth Judicial District (Brown), and The League of Women Voters of Baton Rouge, Inc. (The League), concern the same factual situations and legal issues and were consolidated and tried together. We will therefore discuss these appeals together.
After the resignation of Dr. Clyde Lindsey, Superintendent of Public Schools in East Baton Rouge Parish, the Board formed a "Superintendent Search and Selection Committee" (the Committee), consisting of all twelve members of the East Baton Rouge Parish School Board and Dr. George Leon Netterville, a member of the East Baton Rouge Parish Bi-Racial Committee, in order to select a new superintendent. The Committee thereafter advertised for and received applications from a number of people, forty-one of which were deemed by them to meet the published criteria. The Committee thereafter began considering these forty-one applications.
On March 18, 1980, following its open public meeting, the Committee went into executive session, purportedly to discuss the character, competence and physical and mental health of the forty-one applicants. Immediately following its executive session, the Committee reconvened in open public session and nominated by name and voted to give further consideration, including personal interviews, to ten of the forty-one applicants.
By letter dated March 18, 1980, above the signature of George H. Richard, as chairman of the Committee, the ten applicants were informed that they would receive "additional consideration" and would be asked to return for a one hour personal interview with the Committee. The thirty-one other applicants received a letter, dated March 19, 1980, and signed by George H. Richard, as chairman of the Committee, informing them that "the Committee's selection of finalists does not include your application."
On March 31, 1980, the Committee again met in open public session, and thereafter, with the exception of three of its members, Robert C. Crawford, Michael McCleary, and George H. Richard, the Committee convened itself in executive session. This executive session was again for the purported reason of further discussing the character, competence and physical and mental health of the ten applicants who had been given further consideration. Again, after its executive session, the Committee held an open public session in which the Committee voted to give further consideration to four named applicants.
Shortly thereafter the six applicants not included in the final four were notified by telephone of the Committee's action.
On April 3, 1980, pursuant to a written complaint filed with him by the president of The League, plaintiff Brown filed suit in order to have the court declare the actions of the Board on March 18, 1980, and March 31, 1980, as represented by the Committee, void as provided in LSA-R.S. 42:9 and LSA-R.S. 42:11 A(4). On April 7, 1980, The League, through its own attorney, filed suit against the Board seeking a writ of mandamus ordering the Board to comply with the provisions of LSA-R.S. 42:4.1, et seq., a judgment declaring that the actions taken by the Board and/or the Committee in an "illegal executive session" be set aside and injunctive relief prohibiting the Board from holding closed meetings in violation of LSA-R.S. 42:4.2, et seq.
Subsequently, The League amended its petition to allege that an additional closed *1151 meeting of the Committee took place on or about April 10 or 11, 1980, at the office of committee member Randall Goodwin, and further sought statutory attorney's fees and costs.
At the trial of these suits, after plaintiffs had closed their case, defendants moved for a directed verdict, which the court granted in part and denied in part. In ruling on the motion for directed verdict the trial court found as a fact that there was no final action taken at any of the meetings complained of. The motion was further granted in that the court found that the alleged meeting at Randall Goodwin's office was in fact not a meeting of the school board or any of its committees. The motion was denied as it pertained to the Committee's executive sessions held on March 18, 1980, and March 31, 1980, the court finding that plaintiffs had made a showing that these executive sessions were not within the exeception set out in the open meetings law. The trial court then afforded defendants an opportunity to present their evidence, however, defendants chose to rest their case without presenting further evidence. The trial court rendered judgment on the merits in favor of both plaintiffs, declaring that the actions of the Board[1] in the above referred to executive sessions were not within the exceptions to the open meetings law and were, in fact, in violation of that law. Judgment was further rendered enjoining the Board from further violations of LSA-R.S. 42:4.1, et seq., and all demands for attorney's fees were denied.
Defendant[2] has appealed the trial court's finding that the executive sessions of March 18, 1980, and March 31, 1980, violated the open meetings law and the permanent injunction issued against it. In an answer to defendant's appeal, The League complains of the trial court's refusal to allow testimony about the matters discussed at the April 10 or 11, 1980, meeting at Randall Goodwin's office and further complained of the trial court's finding that this was not an illegal closed meeting held in violation of the open meetings law and of the trial court's denial of attorney's fees. The League further prays for reasonable attorney's fees on appeal.
The first issue presented on appeal is whether the executive sessions of March 18, 1980, and March 31, 1980, or any of the actions taken by the Committee in these executive sessions, violated the Louisiana Open Meetings Law.
At trial the parties stipulated that the Committee's meetings held on the above referred to dates fall within the meaning of the term "meeting" as defined in and covered by the open meetings law. These committee meetings must therefore have been open to the public, unless closed pursuant to R.S. 42:6 (providing for executive sessions)[3] and R.S. 42:6.1 (providing the reasons for an executive session). LSA-R.S. 42:5.
In its answer to these suits, defendant relies upon an exception to the open meetings law contained in R.S. 42:6.1 A(1), which allows a public body to hold an executive session for "discussion of the character, professional competence, or physical or mental health of a person ...." Defendant maintains that its actions during these executive sessions were within the statutory exemption. Plaintiffs, however, contend that defendant's actions in these closed meetings exceeded the bounds of the statutory exemption, in that the Committee went further than merely "discussing" the applicants.
*1152 The trial court found that the Board's actions during the two executive sessions at issue exceeded the scope of the exception allowing discussion of the character, professional competence or physical or mental health of the person, in that the Committee moved from strictly discussion to a selection process by a vote or polling of the committee members. We agree with this aspect of the trial court's interpretation of the open meetings law and this exemption.[4]
The committee members who testified stated that, during the executive session held on March 18, 1980, there was some discussion concerning the character, professional competence and general qualifications of the forty-one applicants under consideration. They further testified that, after this general discussion, a procedure to reduce the number of applicants under consideration was devised, whereby each committee member[5] would write down on separate slips of paper the names of ten of the forty-one applicants to whom that member desired to give further consideration. Dr. Netterville then stacked these slips of paper by name and counted the number of slips in each stack. Only the ten applicants whose names appeared on the greatest number of slips of paper would be given a one hour, personal interview and other further consideration. Testimony of the committee members further indicated that a similar procedure was used during the executive session held on March 31, 1980, in order to further reduce the number of applicants being considered from ten to four. During this March 31st meeting each committee member wrote down on a slip of paper the names of four of the remaining ten applicants, and their first choice (the first name on their list) was given four points, the second received three points, etc. The four applicants with the most points would be given further consideration.
The committee members who testified insisted that their action in these closed sessions was not a vote, nor was it final action, and that none of the original forty-one applicants was ever finally eliminated until the actual selection of a superintendent was made. They further testified that any of the original forty-one applicants, or others, could be nominated and/or considered by committee members and, in fact, selected as superintendent by the Board.
In its reasons for judgment, however, the trial court, while acknowledging the committee members' good faith belief that their actions were not final, found that these actions constituted a vote, the practical effect of which was to reduce the number of people under active consideration and to in effect eliminate all but those ten, and then four, applicants named after each of the executive sessions. The evidence clearly supports this finding.
*1153 Committee member Robert Crawford testified that he considered the actions taken in these closed sessions as a "process of elimination." He also said that, after the closed meeting on March 18, while he was free to nominate someone other than the ten selected for further consideration, he did not want to nominate anyone else if the other members of the committee did not want to give that person further consideration when asked, under cross examination, if it was his impression that he would be wasting his time if he nominated anyone else other than the ten, he replied, "At that point, I imagine so." Another committee member, George Richard, testified that prior to the closed meeting on March 18, the Committee had agreed that they would attempt to reduce the number of applicants to ten or less, in order to facilitate their evaluation of the candidates. He also stated, and it is undisputed, that no one other than the ten applicants named after the March 18 meeting were ever interviewed.
The record also contains a letter written to the thirty-one applicants who were not chosen by the Committee for personal interviews and further consideration. This letter, written by Mr. Richard, as chairman of the Committee[6], states in part that, "The Committee's selection of finalists does not include your application." [Emphasis ours.] The evidence shows that the thirty-one applicants who received this letter were not granted personal interviews and received no further consideration by the Committee.
In reviewing this record it is clear that the practical effect of the actions taken by the Committee in these closed sessions was a decision by the Committee to select certain of the applicants for further consideration and to reject the others. Defendant argues that the actions taken by the Committee in this process of elimination were not final or binding, and therefore not prohibited by R.S. 42:6. In support of this contention defendants point to the evidence indicating that the Committee was in no way prohibited from considering any of the forty-one applicants or from choosing any of them, or any other person, as superintendent. While this is technically true, we find that the Committee believed itself to be engaged in a process of elimination and actually engaged in selecting certain persons for further consideration and rejecting others. All of the conduct and actions taken by the Committee, and its individual members, during and subsequent to these closed meetings, including the letter of March 19, 1980, written by Mr. Richard, support this conclusion. As the trial court stated in its written reasons, public bodies cannot meet in private, closed sessions and effectively make decisions, which are merely re-enacted pro forma, in a later open session. We find, as did the trial court, that the actions of the committee members during these closed sessions, in writing down the names of favored applicants was a vote taken in closed sessions, which had the effect of a written, secret ballot and, even if not final, was in violation of the prohibitions contained in R.S. 42:5 B and C.
Defendant argues that this "show of support" procedure was nothing more than a shorthand method of comparatively evaluating the character, professional competence, or physical or mental health of the applicants, which is sanctioned by the exception to the open meetings law. We disagree, and find, as did the trial court, that only "discussion" is allowed by the exception and that the procedure employed by the Committee went well beyond mere discussion and, in fact, became a selection or vote, which is not sanctioned by any exemption contained in this law.
*1154 R.S. 42:5 A provides that, "Every meeting of any public body shall be open to the public unless closed pursuant to R.S. 42:6 and R.S. 42:6.1." R.S. 42:6.1 A states that, "A public body may hold an executive session pursuant to R.S. 42:6 for one or more of the following reasons ...", and thereunder provides eight reasons for an executive session. The intent of the open meetings law is to open all meetings of public bodies to the public, unless allowed by this law to be closed. In construing R.S. 42:5 A and 42:6.1 A, and because the exemptions contained in R.S. 42:6.1 A(1)-(8) are in derogation of the broad public policy of openness, we find that these eight enumerated reasons for an executive session are exclusive. Therefore, only these enumerated actions may be taken during an executive session. In reading these exemptions to the open meetings law, and especially R.S. 42:6.1 A(1), relied upon by defendant, we find that nowhere in these eight enumerated exemptions is a vote, poll or "show of support" allowed to be held in an executive session.
Defendant also argues that this procedure of writing down the names of the applicants was a rating by the committee members of the relative professional competence of the applicants, which could be humiliating or embarrassing to the applicants if required to be done in public. Again, we disagree.
In support of this position defendant argues that, because the open meetings law and the public records law are closely related in both purpose and design, cases decided under the public records law should be persuasive, if not controlling authority in this present case. While this may be true, we find that the case of Trahan v. Larivee, 365 So.2d 294 (La.App. 3rd Cir., 1978), writ denied 366 So.2d 564, and the other similar cases cited by defendant as analagous to this present situation, are factually distinguishable from this present case. In Trahan, supra, the information sought was of a specific, personal and individualized nature, whereas in this present case a public vote would reveal nothing more than each board member's conclusion as to which applicant or applicants should be given further consideration. We find that requiring that this vote or selection process be held in public is in no way comparable to the disclosure of the performance evaluations and ratings at issue in Trahan, supra. We also note that the selection of a superintendent of schools is by nature a public undertaking, while the personal, individualized evaluation of employees is generally of a more private nature, and, as in Trahan, supra, usually intended from the outset to be confidential.
In all selection processes there are winners and losers; those who are chosen and those who are not. Except for the one applicant who was selected, it was inevitable that all those who applied for this position would be rejected. And, this fact must unavoidably become public knowledge. This is true whether the selection or voting is done in public or private. While those who are not chosen might naturally be more comfortable with a private display of the relative support each obtained, we believe that promoting the public policy of openness mandated by this law is far more important to our society as a whole than is the avoidance of whatever slight discomfort, if any, might occur to an individual applicant. And, we do not believe that applicants for this public position could reasonably expect that the actual voting on a group of semi-finalists or finalists would be done in private or kept secret.
The open meetings law expressly provides that the performance of public business in an open and public manner is essential to the maintenance of a democratic society and toward this end mandates that the provisions of this law be liberally construed. LSA-R.S. 42:4.1. In interpreting this law the trial court has faithfully adhered to this mandated public policy. We therefore affirm its judgment with regard to the executive sessions held on March 18, 1980, and March 31, 1980.
The next issue raised by defendant is that the injunction issued by the trial court is invalid because it is overly broad and does not describe in reasonable detail the act or acts to be restrained.
*1155 As the judgment is now cast, it reads in pertinent part:
"Further judgment is rendered in favor of petitioners and against defendant, enjoining defendant from further violations of the open meetings law, LSA-R.S. 42:4.1 et seq."
La.C.C.P. art. 3605 provides that a final injunction shall describe in reasonable detail, and not by mere reference to the petition or other documents, the act or acts sought to be restrained. Lenfants Caterers, Inc. v. Fireman's Charitable and Benevolent Association of New Orleans, 386 So.2d 1053, (La.App. 4th Cir., 1980).
In order to be found in contempt, a person or entity must act willfully to violate a court's order. La.C.C.P. art. 224. Thus, a final injunction must comply with art. 3605 in order to inform a defendant what conduct is prohibited by the court. The judgment in this case fails to comply with that requirement, because it does not describe in reasonable detail the act or acts sought to be enjoined and is invalid for that reason. We therefore recast the injunction to prohibit defendant from the specific conduct which the trial court found to have violated the open meetings law.
The League complains of the trial court's finding that the gathering of certain board members at the office of board member Randall Goodwin on April 9, 1980, was not an illegal closed meeting of the board. Connected with this issue is The League's objection to the trial court's refusal to allow testimony about the matters discussed at this April 9th meeting.
In an amended petition, The League alleged that:
"At the April 10 or 11, 1980, meeting[7]... members of the board conferred in a series of meetings and/or telephone conferences establishing a `walking quorum' of the board even though an actual quorum of the whole board or committee may or may not have been present at one time in one room."
The trial court allowed some testimony regarding this alleged meeting, however, in response to defendant's objection to further testimony concerning this gathering of board members, the court ruled that a quorum of the board was never present and therefore this was not a "meeting" as provided in the open meetings law. The court then refused to allow further examination of witnesses with regard to this alleged meeting.
The terms "meeting" and "quorum" are defined by the open meetings law as follows:
"(1) `Meeting' means the convening of a quorum of a public body to deliberate or act upon a matter over which the public body as an entity has supervision, control, jurisdiction, or advisory power."
"(3) `Quorum' means a simple majority of the total membership of a public body." R.S. 42:4.2.
The board is composed of twelve members and a simple majority of the board would be seven members. The evidence clearly establishes that at no time were seven members of the board present at the gathering at Mr. Goodwin's office on April 9, 1980. Therefore, the trial court was correct in concluding that an actual quorum of the public body was not present at one time. A strict and technical reading of the open meetings law would require the conclusion that, where an actual quorum of the public body was not present at one time, there could in fact be no "meeting" of that body. The trial court's factual finding that no quorum of the board was present on April 9, which finding is supported by the evidence, would appear to support the conclusion that no meeting of the board took place at that time.
However, because the open meetings law is to be liberally construed, and it expressly prohibits public bodies from utilizing procedures which circumvent its intent, we have carefully examined this record in order to determine if a "walking quorum" did exist, and whether this device had the effect of circumventing the provisions of the open meetings law.
*1156 Concerning the gathering at Mr. Goodwin's office on April 9th, the evidence is to the effect that Mr. Richard, the chairman of the committee, was out of town on this day and had asked Mr. Goodwin to fill in for him at the meeting with Mrs. Armstrong, the president of the board, and Dr. Rice, who had been selected as the new superintendent. Upon returning to Baton Rouge, Mr. Richard contacted Mr. Goodwin and arranged to meet him later that day in order to be informed of what had occurred with Dr. Rice. The evidence clearly indicates that the meeting at Mr. Goodwin's office was not designed to be a Board or Committee meeting and was not intended for the purpose of making any decision or taking any action. The evidence further establishes that only six board members were present at Mr. Goodwin's office, and that no other board members were in the hall or contacted by telephone or otherwise. The evidence further indicates that none of those present left this meeting and no other board members arrived during the meeting.
The trial court allowed plaintiffs to fully explore the issue of whether an actual or "walking" quorum of the Board or Committee was present or existed on April 9, 1980. Further examination on this subject was disallowed only when it became evident that plaintiffs were unable to establish that a quorum, or its equivalent, did exist, which is necessary in order to find that a "meeting" took place. The trial court was correct in its refusal to allow The League to continue its cross examination on this subject.
We find that, while not strictly a chance meeting, this gathering of the six board members at Mr. Goodwin's office on April 9, 1980, was not prearranged, and that, except for Mr. Richard and Mr. Goodwin, the members who attended did so on their own and merely because they were aware that Mr. Richard would be at Mr. Goodwin's office that night. We further find that this gathering at Mr. Goodwin's office was intended only to inform Mr. Richard and was not intended or used by the Board as a device to circumvent the open meetings law. Based on the evidence, we believe that the trial court was correct in finding that this April 9, 1980, gathering at Mr. Goodwin's office was not an illegal closed meeting of the Board or Committee.
The final issue on appeal is The League's claim for attorney's fees. Although The League sought attorney's fees below, the trial court denied all demands for attorney's fees. In its answer to defendant's appeal, The League has reurged its claim for attorney's fees in the trial court and has further requested attorney's fees on appeal.
With regard to attorney's fees, the open meetings law provides that:
"If a person who brings an enforcement proceeding prevails, he shall be awarded reasonable attorney's fees and other costs of litigation. If such person prevails in part, the court may award him reasonable attorney's fees or an appropriate portion thereof." LSA-R.S. 42:11 C.
The trial court gave no reasons for its denial of attorney's fees and defendant argues that, because plaintiff Brown had already filed suit in order to enforce the open meetings law at The League's request, The League's suit was unnecessary and they should therefore be denied attorney's fees. However, we find that plaintiff Brown, for whatever reason, did not seek injunctive relief against the Board in order to enjoin them from further violating the open meetings law. Thus, The League sought relief other than that sought by plaintiff Brown, and was successful in obtaining this injunctive relief. The League, however, did not prevail in its attempt to have the alleged illegal actions of the Board set aside, nor was it successful in having the gathering of six board members on April 9, 1980, declared to be an illegal closed meeting of the Board.
While the award of attorney's fees to a party who only prevails in part is discretionary, we believe that the injunctive relief sought and obtained only by The League is in itself so important to the enforcement of the open meetings law that the trial court's total denial of attorney's fees to The League is clearly wrong. We find that The League should be awarded attorney's fees, for both trial and appeal.
*1157 Other than the pleadings and the transcript of the proceedings below, the record contains no evidence as to what amount of attorney's fees is reasonable. We therefore remand this case to the trial court in order for it to determine what amount of attorney's fees, both at trial and on appeal, is appropriate.
For the foregoing reasons, the judgment of the trial court finding that defendant's actions, both its own and those taken through its committee, during the executive sessions held on March 18, 1980, and March 31, 1980, violated the Louisiana Open Meetings Law is affirmed. We also affirm the trial court's finding that the gathering held at the office of board member Randall Goodwin on April 9, 1980, was not an illegal closed meeting of the East Baton Rouge Parish School Board or of the Superintendent Search and Selection Committee. Further, the judgment granting the permanent injunction against defendant is amended and judgment is hereby rendered permanently enjoining defendant from: (1) Holding executive sessions for the express purpose of deciding or actually deciding issues before it during an executive session; (2) voting, polling of members or determining the support of its members for or against an issue before it, whether in writing, orally or otherwise, during an executive session; and (3) doing anything during an executive session which is the equivalent of a vote, poll or show of support, whether in writing, orally or otherwise. The judgment of the trial court denying The League attorney's fees is reversed. The League is hereby awarded reasonable attorney's fees, both at trial and on appeal, and this case is remanded to the trial court in order to fix that amount of attorney's fees.
AFFIRMED IN PART, AMENDED IN PART, REVERSED IN PART AND REMANDED.
NOTES
[1] While both the Board and the Committee were named as defendants in these suits, the trial court's judgment refers only to the Board. We find no significance in this, however, because the Board was acting through the Committee and the Committee's actions were, in fact, the actions of the Board.
[2] Hereafter the term "defendant" refers to the Board only.
[3] While LSA-R.S. 42:6 provides certain mandatory procedures for convening an executive session, no procedural deficiency has been alleged. We will therefore not discuss these procedural requirements nor the procedures employed by the committee in convening the executive sessions.
[4] In its petition, The League also alleges that, "There is no legal authorization for an executive session to consider the qualifications of potential school board administrators." From this allegation it might appear that The League contests the Board's right to hold executive sessions even for the limited purpose of discussing the character, professional competence or physical or mental health of a potential school board administrator. In its written reasons, while finding that the Board violated the open meetings law because its actions in these closed sessions went beyond mere discussion of the "character, professional competence or physical or mental health of a person", the trial court implies that the open meetings law allows an executive session to consider the qualifications of potential school board administrators, where this consideration is limited to discussion of the character, professional competence or physical or mental health of the applicants. While this appears to be a rejection of The League's above referred to allegation, The League has not appealed and, neither in its answer to defendant's appeal nor in its appellate brief has The League contested this finding of the trial court. We therefore will not consider and express no opinion on the correctness of that holding or on the issue of whether, even for the purpose of discussing the matters found in R.S. 42:6.1 A(1), the open meetings law authorizes the Board's consideration of the qualifications of potential school board administrators in executive session.
[5] Although Dr. Netterville was a member of the Committee, and nothing in evidence indicates that he was not qualified to or allowed to vote with the Committee, the evidence shows that Dr. Netterville did not vote with the Committee, nor did he participate in writing down on slips of paper the names of the applicants he favored for additional consideration.
[6] The evidence indicates that the Committee as a whole was aware of this letter's being sent by Mr. Richard, as chairman of the Committee, and that the letter represented the consensus of the Committee. We find this present situation factually distinguishable from the case of Parent-Community Alliance for Quality Education, Inc. v. The Orleans Parish School Board, 385 So.2d 33, (La.App. 4th Cir., 1980), writ denied 386 So.2d 1379, in which the court found that a letter sent by the president of the school board to certain applicants for the position of superintendent, telling them that they were not among the persons recommended to be hired, was merely the ex parte action of one of the members of the board and thus did not show a violation of the open meetings law by final or binding action taken at an executive session.
[7] The evidence later established that this gathering was held on April 9, 1980.